### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

JENZABAR, INC.,

               Plaintiff,

v.

CAMPUS MANAGEMENT CORPORATION,

               Defendant.

Civil Action No. 08-11117 NMG

### JENZABAR, INC.'S ANSWER TO CAMPUS MANAGEMENT CORPORATION'S COUNTERCLAIMS AND JENZABAR'S FURTHER COUNTERCLAIMS

Plaintiff, Defendant-in-Counterclaim, and Counterplaintiff, Jenzabar, Inc. ("Jenzabar") answers the Counterclaims of Defendant, Campus Management Corp. ("CMC") as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Jenzabar admits the allegations in Paragraph 1 of the Counterclaim.

2.      Jenzabar admits the allegations in Paragraph 2 of the Counterclaim.

3.      Jenzabar admits that the Court has subject matter jurisdiction over the parties' Lanham Act claims and supplemental jurisdiction over CMC's state law claims.

4.      Jenzabar admits that it maintains a principal place of business and conducts substantial business in the Commonwealth of Massachusetts, has offered and sold goods and services here, and has otherwise directed its activities into this forum, and that Jenzabar is subject to personal jurisdiction in this Court.  Jenzabar denies the remaining allegations in Paragraph 4, and particularly the allegation that Jenzabar has committed acts of infringement.

5.      Jenzabar admits that venue is proper in the Court and that Jenzabar is subject to personal jurisdiction in this Court.  Jenzabar denies the allegation that any events have occurred in this district that would result in any liability on CMC's counterclaims.

## FACTUAL ALLEGATIONS

6.      Jenzabar admits that CMC provides enterprise and administrative software solutions to educational institutions.  Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6 of the Counterclaim.

7.      Jenzabar admits that the public records of the US Patent and Trademark Office indicate that CMC has been issued Registration Certificates for U.S. Trademark Registration Nos. 2,965,722 ("the '722 Registration") and 3,259,702 ("the '702 Registration"), but Jenzabar denies that those registrations are valid, enforceable, or infringed.  Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 7 of the Counterclaim.

8.      Jenzabar admits that the public records of the US Patent and Trademark Office indicate that CMC has been issued the '722 Registration, and that that Registration purports to cover the words and design depicted on the certificate, but Jenzabar denies that the Registration is valid, enforceable, or infringed.  Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 of the Counterclaim.

9.      Jenzabar admits that the public records of the US Patent and Trademark Office indicate that CMC has been issued the '722 Registration, that the PTO records indicate that the application for the '722 Registration was filed on September 22, 2003, and that the PTO records indicate that the '722  Registration issued on July 12, 2005.  Jenzabar further admits that the '722 Registration purports to cover the services identified on the certificate of registration.  Jenzabar denies that the Registration is valid, enforceable, or infringed.  Jenzabar is without information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 of the Counterclaim.

10.     Jenzabar admits that the public records of the US Patent and Trademark Office indicate that CMC has been issued the '702 Registration and that that registration purports to cover CAMPUS MANAGEMENT CORP in standard characters.  Jenzabar denies that the Registration is valid, enforceable, or infringed.  Jenzabar is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10 of the Counterclaim..

11.     Jenzabar admits that the public records of the US Patent and Trademark Office indicate that CMC has been issued the '702 Registration, that the PTO records indicate that the application for the '702 Registration was filed on September 22, 2003, and that the PTO records indicate that the '702  Registration issued on July 10, 2007.  Jenzabar further admits that the '702 Registration purports to cover the services identified on the certificate of registration.  Jenzabar denies that the Registration is valid, enforceable, or infringed.  Jenzabar is without information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 of the Counterclaim.

12.     Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 of the Counterclaim, and therefore denies them.

13.     Jenzabar admits that the allegations in Paragraph 13 of the Counterclaim characterize a portion the statutory language of § 33(a) of the Lanham Act (15 U.S.C. § 1115(a)), but states that this allegation is legal rather than factual.  Jenzabar denies that CMC's purported marks are valid, enforceable, or infringed, or that CMC is entitled to any exclusive rights to use the generic and descriptive phrase "campus management."  Jenzabar is without knowledge or

information sufficient to form a belief as to the truth of any factual allegations in Paragraph 13 of the Counterclaim.

14.     Jenzabar admits that it uses the trademark and service mark TOTAL CAMPUS MANAGEMENT in commerce in connection with computer consulting services in the field of design, selection, implementation and use of computer software and hardware systems for others. Jenzabar denies the remaining allegations in Paragraph 14 of the Counterclaim, including the implication that Jenzabar requires authorization from CMC to use the TOTAL CAMPUS MANAGEMENT mark.

15.     Jenzabar admits the allegations in Paragraph 15 of the Counterclaim.

16.     Jenzabar admits that the software and service the parties provide to institutions of higher education have certain similarities, and that CMC and Jenzabar are competitors in certain segments of the market.  Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16 of the Counterclaim that CMC commenced use of CMC's Mark long before Jenzabar's first use of TOTAL CAMPUS MANAGEMENT, and therefore denies them.  Jenzabar denies the remaining allegations in Paragraph 16 of the Counterclaim.

17.     Jenzabar admits only so much of the allegations in Paragraph 17 of the Counterclaim as allege that CMC and Jenzabar are competitors in the area of software and services marketed to institutions of higher education and that the parties market, promote and publicize their goods and services throughout the United States, through the Internet and other channels of trade, but denies that there is any likelihood of confusion attributable to Jenzabar's use of its TOTAL CAMPUS MANAGEMENT mark.  Jenzabar is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17 of the Counterclaim, and therefore denies them.

18.     Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the Counterclaim and therefore denies them.

19.     Jenzabar denies the allegations in Paragraph 19 of the Counterclaim.

20.     Jenzabar admits only so much of the allegations in Paragraph 20 of the Counterclaim as allege that if Jenzabar's application is allowed to proceed to registration, Jenzabar would have at least a prima facie exclusive right to use TOTAL CAMPUS MANAGEMENT in connection with the services recited in that application.    Further answering, Jenzabar denies the implication that it has not already established exclusive rights in the TOTAL CAMPUS MANAGEMENT mark. Jenzabar denies the remaining allegations in Paragraph 20 of the Counterclaim, including the allegation that registration by Jenzabar of TOTAL CAMPUS MANAGEMENT would be a source of damage and injury to CMC.

21.     Jenzabar denies the allegations in Paragraph 21 of the Counterclaim.

22.     Jenzabar denies the allegations in Paragraph 22 of the Counterclaim.

23.     Jenzabar admits that it has refused to cease use of its TOTAL CAMPUS MANAGEMENT mark.  Jenzabar denies the remaining allegations in Paragraph 23 of the Counterclaim.

## COUNT I

### Violation of the Lanham Act - Federal Trademark Infringement

24.     Jenzabar restates and re-alleges its responses to Paragraphs 1 though 24 of the Counterclaim as if fully set forth herein.

25.     Jenzabar denies the allegations in Paragraph 25 of the Counterclaim.

26.     Jenzabar denies the allegations in Paragraph 26 of the Counterclaim.

## COUNT II

### Violation of the Lanham Act - Federal Unfair Competition

27.     Jenzabar restates and re-alleges its responses to Paragraphs 1 though 26 of the Counterclaim as if fully set forth herein.

28.     Jenzabar is without knowledge or information sufficient to form a belief as to the truth of the allegation of Paragraph 28 of the Counterclaim that Jenzabar began using its TOTAL CAMPUS MANAGEMENT mark to identify its goods and services long after CMC's first use of its CAMPUS MANAGEMENT CORP Mark.  Jenzabar denies the remaining allegations in Paragraph 28 of the Counterclaim.

29.     Jenzabar denies the allegations in Paragraph 29 of the Counterclaim.

30.     Jenzabar denies the allegations in Paragraph 30 of the Counterclaim.

## COUNT III

### Massachusetts Unfair and Deceptive Trade Practices and Unfair Competition (Mass. Gen. L. ch. 93A S§ 2 and 11)

31.     Jenzabar restates and re-alleges its responses to Paragraphs 1 though 30 of the Counterclaim as if fully set forth herein.

32.     Jenzabar denies the allegations in Paragraph 32 of the Counterclaim.

33.     Jenzabar admits that it continues to use the TOTAL CAMPUS MANAGEMENT mark in connection with its goods and services, and denies that its use of the mark causes any damage to CMC.  Jenzabar denies the remaining allegations in Paragraph 33 of the Counterclaim.

34.     Jenzabar denies the allegations in Paragraph 34 of the Counterclaim.

## PRAYERS FOR RELIEF

Jenzabar denies that CMC is entitled to any of relief prayed for in the Counterclaim, and Jenzabar requests that the Court enter judgment on each Count of the Counterclaim in favor of Jenzabar and against CMC, that CMC take nothing by any of its Counterclaims, and that Court award such other relief as is proper.

## ADDITIONAL DEFENSES

### First Defense

CMC's Counterclaims fail to state a claim upon which relief can be granted.

### Second Defense

CMC's Counterclaims are barred by the doctrine of laches.

### Third Defense

CMC's Counterclaims are barred by the doctrine of waiver and/or estoppel.

### Fourth Defense

CMC's Counterclaims are barred by the doctrines of fraud and unclean hands, by at least the fact that CMC obtained and maintained the CMC Mark by fraud on the United States Patent and Trademark Office, including by deliberately failing to disclose the widespread use of "campus management" as a generic and descriptive term.

### Fifth Defense

CMC's Counterclaims are barred by CMC's wrongful and illegal use of the federal registration symbol in connection with its marks at a time when its marks were not in fact federally registered.

### Sixth Defense

Jenzabar reserves the right to assert additional defenses or limitations on damages upon discovery of facts not currently known.

**JENZABAR, INC.'S COUNTERCLAIMS AGAINST
CAMPUS MANAGEMENT CORPORATION**

The counterclaims asserted by Defendant and Plaintiff-in-Counterclaim Campus

Management Corp. ("CMC") introduce additional issues into the lawsuit, which give rise to

additional counterclaims by Plaintiff and Defendant-in-Counterclaim Jenzabar against CMC,

which Jenzabar here asserts.

**FACTUAL ALLEGATIONS**

**For More Than 20 Years, Jenzabar Has Offered
Campus Management Software, And For the Past Five Years
It Has Been Using Its TOTAL CAMPUS MANAGEMENT Mark**

1.      Jenzabar provides enterprise and administrative software solutions to educational

institutions.  Jenzabar's software and services are widely used by institutions of higher education

for managing their campuses and conducting administrative functions, such as admissions,

financial aid, course registration and development, e-learning, and fundraising.

2.      Enterprise administrative software like that offered by Jenzabar is, and has long

been, commonly known as campus management software.

3.      Jenzabar (including its predecessors in interest) has been offering campus

management software and services in interstate commerce for over twenty years.

4.      Since at least as early as November 2003, Jenzabar has owned and used the

TOTAL CAMPUS MANAGEMENT mark in conjunction with its software offerings and

services.

5.      Jenzabar's TOTAL CAMPUS MANAGEMENT mark is a clever play on the

ubiquitous catchphrase "total quality management," also known as "TQM."  According to the

International Standards Organization ("ISO"), total quality management "is a management

approach for an organization, centered on quality, based on the participation of all its members and aiming at long-term success through customer satisfaction, and benefits to all members of the organization and to society." ISO 8402:1994.

6.    The TOTAL CAMPUS MANAGEMENT mark has been duly registered with the Commonwealth of Massachusetts, Massachusetts Reg. No. 67066, for use in connection with computer consulting services in the field of design, selection, implementation and use of computer software and hardware systems for others.

7.    Jenzabar has invested substantial time, effort and money in advertising, marketing and promoting its software and services under the TOTAL CAMPUS MANAGEMENT mark. As a result, over the past five years the mark has become well-known to the relevant consumers and associated with Jenzabar and its software solutions and services.

### CMC And Its Founders Have A Long  And Admitted History  Of Fraudulent Conduct And Outright Disregard For The Law

8.    CMC is a competitor of Jenzabar.

9.    In its marketing materials and on its website, CMC claims to have been founded in 1988 (see http://www.campusmgmt.com/company/company.asp).  In fact, according to the filings with the Florida Secretary of State's office, the corporation now known as CMC was formed on August 10, 1994.  At the time it was known as "Corporate Data Systems, Inc."  The corporation changed its name to CMC by a filing with the Florida Secretary of State dated October 2, 1995.

10.    Corporate Data Systems, Inc.'s change in its name appears to coincide with the arrival of David W. Meek as part of its management team.  Sometime in 1995, David W. Meek joined the board of directors of CMC, and by May 1997  he became CMC's president and chief executive officer.

11.    CMC's marketing materials state that Meek was its founder, describing him as "a former Wall Street broker" who "founded Campus Management with the vision of helping educational institutions strive for operational excellence."

http://www.campusmgmt.com/about_us/executiveteam.asp.

12.    In fact, Meek had a very checkered past. During his career as a broker, Mr. Meek was involved in and was prosecuted for a string of schemes in which he defrauded dozens, and perhaps hundreds, of people out of millions of dollars.

13.    First, in 1987, Meek was indicted on four counts of violating the Georgia Securities Act and four counts of theft by taking in connection with his sale of interests in oil wells.  *State v. David Walton Meek, et al.*, 87-R-328 (Fayette (Georgia) Superior Court, 1987); *State v. David Walton Meek, et al.*, 87-R-329 (Fayette (Georgia) Superior Court, 1987).

14.    According to the indictment in case no. 87-R-328, Meek defrauded an investor of approximately $75,000, allegedly in connection with the sale of interests in five producing oil wells when, in fact, there were no such wells.  On April 7, 1989, Meek pleaded guilty to the first count of securities fraud, a felony:

BOOK **209**PAGE **10**

## PLEA OF DEFENDANT

      The defendant, DAVID WALTON MEEK, waives formal arraignment and pleads GUILTY as to Count I of Indictment Number 87R-328.

      This 7th day of April, 1989.

_____         _____
Defendant                   Assistant District Attorney

_____
Defendant'a Attorney

*Richard G. Doggett*

     15.    The remaining counts were dismissed as part of the plea bargain.  According to court records, Meek was sentenced to five years probation and was ordered to pay restitution and a fine.

     16.    The plea agreement indicates that Richard G. Doggett was Meek's lawer in these criminal cases.

     17.    According to the indictment in case no. 87-R-329, Meek defrauded another investor of approximately $75,000, again, allegedly in connection with the sale of interests in oil wells that did not exist.  The state dismissed the charges in this case as part of the plea bargain with Meek in case no. 87-R-328.

     18.    Meek's criminal activities in Georgia were not an isolated indiscretion, but part of a much larger pattern.

19.     In February 1989, *Florida Trend* magazine published an article that described

his legal troubles:

> David Meek had a lot going for him at an early age.  At 26, he was the youngest vice
> president in Dean Witter Reynolds' national network.  That was 1981.  A year later, he
> was in business for himself, doing real estate deals with his father-in-law and trading
> commodities.  When federal auditors started looking into Meek's business activities in
> 1983, it signaled the beginning of the end of his meteoric rise in the business world.
> Today, 600 investors would still like to know what happened to $12 million that they
> gave to Meek to invest in domestic and offshore commodity pools.  In January 1987,
> Meek was indicted on 13 counts of fraud on charges that he misled investors and bilked
> them of their money.  In July of that year, in a negotiated agreement, Meek pleaded guilty
> to one count of mail fraud and one count of fraud as a commodity pool operator.

"The Achievers," *Florida Trend* (February 1989) at page 28.

20.     Publicly available court records reveal that in 1987, Meek was indicted on 13

counts of commodities fraud and mail fraud in connection with his sale of interests in

commodities pools.  *United States v. David W. Meek*, 87-6009-CR (S.D. Fla. 1989).

21.     According to the federal indictment, issued on January 15, 1987, Mr. Meek

developed a scheme to defraud investors, by persuading them to put their money into

commodities pools that were losing money.  The grand jury accused Mr. Meek of providing

investors with false earnings reports, covering up huge losses, and stealing the money that he

was supposed to have invested.

22.     On January 30, 1989, Mr. Meek pleaded guilty to one count of mail fraud and one

count of federal commodities fraud.  He was sentenced to federal prison for one year, placed on

probation for five years, ordered to pay a fine, and ordered to pay restitution:

## United States District Court

FILED by _____ D.C.

SOUTHERN   **DISTRICT OF** FLORIDA

JAN 30 1989

ROBERT M. MARCH
CLERK U.S. DIST. CT.
S.D. OF ____ LAUD.

UNITED STATES OF AMERICA

V.

**JUDGMENT IN A CRIMINAL CASE**

DAVID W. MEEK
SS#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
6900 Calle del Paz North
Boca Raton, FL  33433

_Case Number:_    87-6009-CR-ZLOCH

(Name and Address of Defendant)

Steven LeClair, Esq.
**Attorney for Defendant**

THE DEFENDANT ENTERED A PLEA OF:

[☒ guilty  ☐ nolo contendere] as to count(s) 2 and 6 _____, and
☐ not guilty as to count(s)_____.

THERE WAS A:
[☒ finding  ☐ verdict] of guilty as to count(s)__2 & 6_____;

THERE WAS A:
[☐ finding  ☐ verdict] of not guilty as to count(s)_____.
☐ judgment of acquittal as to count(s)_____.
   The defendant is acquitted and discharged as to this/these count(s).

THE DEFENDANT IS CONVICTED OF THE OFFENSE(S) OF:   mail fraud in violation of
18:1341 - Count 2 - 1/82 - 1/85; Fraud by a commodity Pool Operator in
violation of 18:60(1) and 13(b) - Count 6 - 1/82 - 12/85.

IT IS THE JUDGMENT OF THIS COURT THAT:  the defendant is hereby committed to the
custody of the Attorney General of the United States or his authorized
representative for imprisonment for a term of One (1) YEAR as to Count 2
of the Indictment.
Imposition of sentence on Count 6 of the Indictment is hereby suspended and
the defendant placed on reporting probation for a period of FIVE (5) YEARS
to run consecutive to the sentence imposed on Count 2, including any parole
or other supervision time.
IT IS FURTHER ORDERED AND ADJUDGED that the defendant is fined $10,000 as
to Count 6.  Said fine is to be paid during the period of probation imposed
herein and in installments as directed by the U. S. Probation Office.
As a special condition of probation, IT IS FURTHER ORDERED that the defendant
pay cost of prosecution.  IT IS FURTHER ORDERED that the U. S. Attorney's
Office provide the amount of the cost of prosecution within 60 days from this
date.  IT IS FURTHER ORDERED AND ADJUDGED the defendant shall pay restitution
in accordance with the order of the Court in Case#85-6451-Civ-GONZALEZ.
In addition to any conditions of probation imposed above, IT IS ORDERED that the conditions of proba-
tion set out on the reverse of this judgment are imposed.

23.     Even after pleading guilty to multiple violations of state and federal laws, Meek

continued to flout the law.

24.     As a condition of Meek's probation in Georgia, for instance, he was ordered to

pay restitution to the investors he had defrauded, but he did not make these payments.

25.     In 1991, the Florida Department of Probation filed an affidavit with the Georgia

courts, reporting that Meek had violated the conditions of his probation.  Meek was held in the

custody of the Palm Beach County jail, in February 1991 until he agreed to pay fines, costs, and

restitution and agreed to pay additional restitution in future installments.

THE SUPERIOR COURT OF FAYETTE COUNTY, GEORGIA

CRIMINAL DIVISION

CASE NO. 87-R-328

THE STATE OF GEORGIA

    Plaintiff,

RECEIVED

FEB 21 1991

FAYETTEVILLE PROBATION OFFICE

vs.

DAVID WALTON MEEK, FILED IN THE OFFICE OF CLERK OF SUPERIOR COURT

    Defendant.   FAYETTE COUNTY, GEORGIA AT 3:00 O'CLOCK P. M.

THE 25th DAY OF February 19 91.

W. W. Ballard, CLERK

**STIPULATED AGREEMENT**

The Defendant, DAVID WALTON MEEK, by and through his undersigned counsel hereby agrees and consents to the entry of an order with respect to the Affidavit for Violation of Probation in Criminal Action No. 87-R-328, as follows:

1.   The Defendant shall pay $21,000.00 toward the total restitution of $35,000.00.

2.   The Defendant shall pay $2,550.00 representing fine and costs in the above captioned case.

3.   The Defendant agrees and stipulates that he shall pay $7,000.00 no later than April 6, 1992 and $7,000.00 no later than April 6, 1993. After the entire restitution, in the amount of $35,000.00, is paid. The Department of Probation and the District Attorney's Office will recommend termination of the balance of the probationary term.

4.   Upon receipt of this executed Agreement, the Department of Probation shall withdraw its Affidavit for Violation of Probation

1

14

and the Defendant shall be placed back on probation under the same terms and conditions as previously set forth subject to the modifications contained herein and the Court shall quash the warrant for the arrest of the Defendant, DAVID WALTON MEEK.

5.   The Department of Probation shall thereafter immediately notify by teletype the Palm Beach County Jail to release the Defendant from custody.

RECE
FEB 21 1991
FAYETTEVILLE PROBATION OFFICE

Respectfully submitted,

LAW OFFICES OF SOVEN & WAX
Attorneys for Defendant
1571 Northwest 13th Court
Miami, Florida  33125
(305)  326-0330

Feb. 19, 1991   BY: _____
Alan R. Soven
Florida Bar No. 259421

Feb 17, 1991   _____
David Walton Meek

Feb 15, 1991   _____
Sally Franco, Supervisor
State of Florida
Department of Probation

26.   Even after having been jailed for failing to pay court-ordered restitution, Meek continued to defy regulators and court orders.

27.   In 1986, the National Futures Association, a self-regulatory body, had expelled Mr. Meek's firm.  According to the NFA website (available at http://www.nfa.futures.org/basicnet/Case.aspx?entityid=0070058&case=86BCC00003&contrib=NFA):

COMPLAINT:

ON FEBRUARY 14, 1986, THE CENTRAL REGIONAL BUSINESS CONDUCT COMMITTEE ("CENTRAL COMMITTEE") ISSUED A COMPLAINT AGAINST COUGAR COMMODITIES, INC. ("COUGAR") ALLEGING VIOLATIONS OF THE FOLLOWING NFA REQUIREMENTS: NFA COMPLIANCE RULE 2-5 FOR FAILURE TO COOPERATE IN NFA INVESTIGATIONS; RULE 2-13 FOR FAILURE TO INCLUDE AN ACCURATE DESCRIPTION OF THE BUSINESS BACKGROUND FOR EACH PRINCIPAL OF THE POOL OPERATOR AND THE POOL'S COMMODITY TRADING ADVISOR; RULE 2-13 FOR FAILURE TO DISCLOSE WHERE POOL FUNDS HELD OUTSIDE THE UNITED STATES WOULD BE HELD; RULE 2-13 FOR FAILURE TO DISCLOSE THAT POOL FUNDS WOULD BE IN- VESTED IN UNREGULATED FOREIGN INVESTMENT FUNDS OR THE RISK INHERENT IN SUCH AN INVESTMENT; RULE 2-13 FOR FAILURE TO DISCLOSE CONFLICTS OF INTEREST; RULE 2-13 FOR FAILURE TO DISCLOSE ANY MATERIAL ADMINISTRATIVE, CIVIL OR CRIMINAL

ACTION TAKEN WITHIN THE FIVE YEARS PRECEDING THE DATE OF THE DISCLOSURE DOCUMENT AGAINST COUGAR AND FOR FAILURE TO AMEND ITS DISCLOSURE DOCUMENT. FUTHERMORE, THE COMPLAINT ALLEGES THAT COUGAR VIOLATED BYLAW 1101 BY TRANSACTING CUSTOMER BUSINESS WITH A NON-MEMBER OF NFA WHO WAS REQUIRED TO BE REGISTERED AND VIOLATED NFA RULE 2-4 BY FAILING TO HONOR ITS FIDUCIARY DUTY TO POOL PARTICIPANTS WHEN IT ABANDONED ITS POOLS AND BY FAILING TO ABIDE BY RESTRICTIONS AND REQUIREMENTS IMPOSED ON IT BY A NFA MEMBER RESPONSIBILITY ACTION. ALSO, THE COMPLAINT ALLEGES THAT COUGAR VIOLATED NFA RULE 2-2 IN THAT DAVID A. MEEK ("MEEK"), A GENERAL PARTNER OF AND TRADING ADVISOR FOR THE COUGAR POOLS, CONVERTED CUSTOMER FUNDS TO HIS OWN USE. MEEK AND MEYER J. PEIKES ("PEIKES") ARE SUBJECT TO A FINDING THAT THEY ARE JOINTLY OR INDIVIDUALLY THE CAUSE OF THE CITED VIOLATIONS BY COUGAR OF NFA REQUIREMENTS.

ANSWER: COUGAR FAILED TO FILE AN ANSWER TO THE COMPLAINT.

DECISION: THE ALLEGATIONS IN THE COMPLAINT ARE DEEMED ADMITTED. COUGAR IS EX-PELLED FROM NFA MEMBERSHIP EFFECTIVE MAY 23, 1986. PEIKES AND MEEK ARE FOUND TO HAVE BEEN THE CAUSE OF THE EXPULSION.

28.     Thereafter, the Commodity Futures Trading Commission (CFTC) filed suit

against Meek as well.  See http://www.nfa.futures.org/basicnet/Details.aspx?entityid=0070058&rn=Y

29.     After Meek and his firm failed to cooperate with a records inspection by the

CFTC in 1985, a federal court issued an injunction:

Release: 2385-85 July 24, 1985 Docket #84-6495-JE

Washington -- The Commodity Futures Trading Commission today announced the entry of a final judgment of permanent injunction against various defendants in CFTC v. David W. Meek, et al., Civil Action No. 84-6495-CIV-EATON (S.D. Fla.). On July 1, 1985, United States District Judge Joe Eaton of the Southern District of Florida, granted the Commission's motion for summary judgment and permanently enjoined defendants David W. Meek, Michael Ezio Gotta, Intercontinent Commodity Advisors, Inc., Com-Trad Systems, Inc., Cougar Commodities, Inc. and Regal Commodities, Inc. from violating the records inspection provisions of the Commodity Exchange Act and applicable regulations.

This order was based on Judge Eaton's finding that the defendants failed to comply with the records inspection provisions of the Commodity Exchange Act and applicable regulations. Additionally, Judge Eaton found that there was a likelihood that the defendants would continue these violations unless specifically enjoined from doing so. This latter finding was based on the defendants' "reluctance" to comply with the records inspection provisions in spite of the court's previous order of preliminary injunction prohibiting violation of these provisions by the defendants.

Specifically, the court's order enjoins the defendants from "failing to keep and make readily accessible and open to inspection and copying by authorized Commission representatives ... all books and records required to be made and kept..." by the Commodity Exchange Act. The order encompasses all books and records of each commodity pool operated by the defendants as well as "... books and records of all other transactions in all other activities in which the pool operator engages..." It further prohibits those

defendants who act as commodity trading advisors form denying Commission representatives access to books and records of their personal commodity accounts.

30.     In June 1992, the CFTC obtained yet another injunction against Meek:

Release: #3514-92 June 29, 1992 Docket #85-6451

WASHINGTON -- The Commodity Futures Trading Commission (CFTC) announced today that on June 9, 1992, Judge Jose A. Gonzalez of the U.S. District Court for the Southern District of Florida has entered, by consent, an order of permanent injunction against David W. Meek of Boca Raton, Florida, in CFTC v. Cougar Commodities, Inc. et al. (No. 85-6451-Civ-Gonzalez). The order is a result of a two-count injunctive complaint filed by the CFTC.

Without admitting or denying the allegations of the complaint, Meek consented to the order permanently enjoining him from violating the anti-fraud provisions of the Commodity Exchange Act and from operating a commodity pool without proper registration. Specifically, the court order permanently enjoins Meek from violating the Act by employing any device or scheme to defraud clients or by engaging in transactions or practices that operate as a fraud or deceit upon clients. The permanent injunction also enjoins Meek from operating a commodity pool without proper registration with the CFTC.

Meek, a former commodity pool operator, was a general partner in commodity pools operated by the now-defunct Cougar Commodities, Inc. of Coral Springs, Florida.

The CFTC charges in the case stemmed from Meek's alleged fraudulent operation of commodity pools involving $2.2 million dollars of customer funds. In addition to the injunctive action, CFTC staff, the Federal Bureau of Investigation, and the United States Attorney for the Southern District of Florida conducted a collaborative law enforcement investigation, which resulted in Meek's indictment and subsequent guilty plea to two counts of mail fraud and one count of fraud by a commodity pool operator.

31.     The CFTC entered at least 9 orders directing Meek to pay reparations to investors.

32.     CFTC records indicate that those amounts remained unpaid through September 15, 2008.  See CFTC's Reparations Sanctions in Effect 1984 - Present (available at

http://services.cftc.gov/sirtsanctions/sirtsanctions.aspx?Topic=ReparationsSanctions).

33.     According to the CFTC disciplinary history website:

You can search CFTC disciplinary history by respondent name, other names used by respondent, CFTC docket number, or National Futures Association ID.

- **Reparations Sanctions in Effect**
  Here you can search reparations sanctions in effect from 1984 to date against individuals or firms who have not paid awards levied against them in proceedings under the CFTC reparations program. Because of their apparent failure to pay reparations awards ordered by the CFTC, the registrations of these individuals or firms have been suspended pursuant to Section 14(f) of the Commodity Exchange Act, 7 USC 18(f), and those listed

here cannot trade on any contract market. This sanction remains in effect until the individual or firm submits proof to the CFTC that the amount required by the final reparations award, or an alternative agreed settlement, has been paid.

- o Only individuals or firms who have not paid reparations awards are included. Any time an individual or firm pays an award, it is deleted from the list.
- o Reparations sanctions in effect from 1975 to 1983 are not searchable here. They are available in list form only: Reparations Sanctions in Effect 1975 - 1983.
- o Note: The effective dates of sanctions imposed in reparations cases filed in fiscal years 1977 through 1988 may not be available.

Names included here are verified by CFTC staff. Individual or firm names are deleted from the reparations sanctions in effect lists when the CFTC receives adequate documentation to verify that payment has been made.

34.     The CFTC Reparations Sanctions in Effect List includes the following

information for Meek as of September 15, 2008:

**Search Reparations Sanctions in Effect by:**

Your query is: [Respondent Name: Meek, David W.] AND [Respondent aka: ALL] AND [CFTC Docket No.: ALL] AND [NFA Id: ALL]
The results for the query dated : 9/15/2008 1:33:16 PM are:

☐ Show All

| Respondent Name | Respondent aka | CFTC Docket No. | NFA Id | Address | Effective Date | Judgment Amount | Interest | Filing Fee | Joint and Several | Explanation |
|---|---|---|---|---|---|---|---|---|---|---|
| Meek, David W. | | 85-R116 | 0070058 | Ft. Lauderdale, FL | | $8,580.24 | 9.15% from 10/15/84 | | No | |
| Meek, David W. | | 85-R335 | 0070058 | Ft. Lauderdale, FL | | $3,453.78 | 7.22% from 12/31/84 | $100.00 | No | |
| Meek, David W. | | 85-R412 | 0070058 | Ft. Lauderdale, FL | | $5,000.00 | | | No | |
| Meek, David W. | | 85-R416 | 0070058 | Ft. Lauderdale, FL | | $5,000.00 | 7.71% from 10/28/83 | $25.00 | No | |
| Meek, David W. | | 85-R437 | 0070058 | Ft. Lauderdale, FL | | $10,514.50 | 7.71% from 10/05/83 | $25.00 | No | |
| Meek, David W. | | 85-R438 | 0070058 | Ft. Lauderdale, FL | | $5,211.65 | 7.71% from 05/23/83 | $25.00 | No | |
| Meek, David W. | | 86-R035 | 0070058 | Ft. Lauderdale, FL | | $8,350.00 | 6.56% from 01/31/84 | $100.00 | No | |
| Meek, David W. | | 86-R065 | 0070058 | Ft. Lauderdale, FL | | $9,749.62 | 6.56% from 12/31/84 | $25.00 | No | |
| Meek, David W. | | 86-R098 | 0070058 | Ft. Lauderdale, FL | | $55,000.00 | 6.56% from 01/01/83 | $200.00 | No | |

35.     According to SEC records, Meek has been barred from the commodities industry.

**Fully Aware of Meek's Multiple Convictions For Fraud, CMC Made Meek A Director And Its CEO, <u>And Then Engaged In A Scheme To Defraud Creditors</u>**

36.     After his career as a commodities broker came to this ignominious end, Meek

apparently became involved with CMC in 1995.

37.     At the time, Richard G. Doggett, Meek's lawyer from the criminal cases in Georgia, was a director of CMC.  Having represented Meek in connection with his guilty pleas, Doggett surely was aware of Meek's criminal history.

38.     Nevertheless, by May 1997, Meek became president of CMC.

39.     Meek was also involved in other questionable ventures with Doggett.  In 1998 and 1999, Meek and various entities that he controlled engaged in a series of transactions with Doggett and entities that he controlled.  Those transactions gave rise to a lawsuit in Colorado against Doggett, Meek, CMC, and others under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").  *Paolini v. Goldstein*, Civ. A. No. 01-K-0275 (D. Colo.).

40.     According to the lawsuit filed in federal court in Colorado, Doggett, Meek, CMC, and their various business entities participated in transfers of funds designed to defraud creditors.

41.     Meek and CMC denied liability, but ultimately in September 2003 the federal court in Colorado ordered Meek and CMC to pay more than $500,000 to the creditors.  Meek and CMC agreed to the entry of this order.

### After Wrongfully Hiring Jenzabar Employees, CMC Began A Campaign Of Illegal And Unethical Conduct Toward Jenzabar

42.     In 2004, Meek and Campus Management began to direct their unfair, deceptive, harassing, and wrongful activities toward Jenzabar.

43.     In April 2002, Mahendran Jawaharlal, a former senior executive at Jenzabar with intimate familiarity with Jenzabar's proprietary technical and business information, left Jenzabar and joined a competitor, then known as SCT/Sungard, in violation of his noncompetition obligations to Jenzabar.

44.     In a preemptive measure, Jawaharlal filed suit in Ohio against Jenzabar, seeking a declaration that he had been relieved of his noncompete obligations.  The Ohio court rejected his claim and in September 2003 ruled in favor of Jenzabar.

45.     Jawaharlal importuned Jenzabar to accept a judgment, representing to both Jenzabar and the Ohio court that he was unemployed and had no job prospects.

46.     Only a few weeks later, on October 1, 2003, Jawaharlal joined CMC as president of the company.  Upon information and belief, given the high-level position he accepted with CMC, Jawaharlal had already been engaged in negotiations with CMC at the time he represented to the Ohio court that he had no job prospects.

47.     After hiring Jawaharlal, CMC began to engage in unethical, wrongful, and illegal conduct toward Jenzabar.

48.     With Jawaharlal's active involvement and the use of Jenzabar's confidential information, CMC wrongfully solicited and hired at least three former Jenzabar employees, including Jack Elcik, Walter Laskarzewski, Ed O'Donnell, and perhaps others.

49.     CMC hired these individuals with knowledge of their noncompete and nondisclosure obligations to Jenzabar, which it caused them to breach, for the purpose of gaining access to Jenzabar's confidential and competitively sensitive information, particularly customer information and Jenzabar's product development plans.

50.     In fact, Laskarzewski and O'Donnell specifically used Jenzabar's confidential information to contact Jenzabar clients and disparage Jenzabar to them.

**CMC Obtained Its Trademark Registrations By Fraud,
Failing To Disclose Widespread Use of "Campus Management" As A Generic Term
And Submitting Patently False Affidavits From Meek**

51.     CMC has similarly engaged in unethical, fraudulent, illegal activity in connection with the trademarks that it now seeks to assert against Jenzabar.

52.     The phrase "campus management" is generic and merely descriptive of the services provided by both Jenzabar and CMC, as well as by many others in the educational field.

53.     Nevertheless, in September 2003 CMC filed applications for federal registrations for CAMPUS MANAGEMENT CORP, despite the fact that the mark is generic and merely descriptive of the services and software provided by CMC.

54.     The Patent and Trademark Office ("PTO") initially rejected CMC's applications, on the ground that they were merely descriptive of CMC's offerings.

55.     In response, CMC acknowledged that the marks were descriptive of campus management services.  CMC argued instead that the phrase "campus management" was so broadly descriptive that it encompassed all types of campus management services, and was not understood to apply to campus management software.

56.     CMC further responded by submitting declarations signed by Meek, in which he swore that "the 'CAMPUS MANAGEMENT CORP' trademark has become distinctive of the goods through Campus Management Corp's substantially exclusive and continuous use in commerce since 1995."

57.     Meek's declarations were false.

58.     CMC deliberately, and with fraudulent intent, failed to disclose to the PTO that the phrase "campus management" was generic and was widely used by many in the educational technology field, including Jenzabar, to describe enterprise and administrative software and related services.

59.     In addition, with deceptive intent and over an extended period of time, CMC deliberately used the federal registration symbol ® in connection with the phrase "campus

management" on its website and in other marketing materials, despite that CMC had neither sought nor obtained a federal registration that covered this phrase.

60.     CMC's use of the federal registration symbol ® in connection with the phrase "campus management" was unauthorized, deceptive, and illegal, in violation of 15 U.S.C. § 1111.

61.     As a result, the PTO ultimately issued U.S. Trademark Registration Nos. 2,965,722 ("the '722 Registration") and 3,259,702 ("the '702 Registration") covering Campus Management's marks.

62.     Starting in the spring of 2005, not long after Jawaharlal became its president, CMC began harassing Jenzabar for its use of the TOTAL CAMPUS MANAGEMENT mark and the phrase "campus management" to describe its software, goods, and services.

63.     On June 8, 2005, Campus Management sent a letter to Jenzabar, insisting that Jenzabar cease its use of the TOTAL CAMPUS MANAGEMENT mark and the phrase "campus management," and threatening immediate legal action for infringement.

64.     By this time, Jenzabar had been using the TOTAL CAMPUS MANAGEMENT mark for nearly two years without complaint from CMC.

65.     Within one week of receiving CMC's demand letter Jenzabar responded in good faith, on June 15, 2005, explaining that CMC's marks were generic, descriptive, and not infringed.

66.     CMC did not take any action to follow up on its threats, and more than three years passed.

67.     During that time, in reliance on CMC's silence, inaction, and acquiescence, Jenzabar continued to advertise and promote its software offerings and services using the

TOTAL CAMPUS MANAGEMENT mark and the phrase "campus management."  As a result of Jenzabar's significant investment of money and resources, its TOTAL CAMPUS MANAGEMENT has become well-known in the marketplace and strongly associated with Jenzabar and its software and services.

68.     Then, on June 24, 2008, CMC sent a new demand letter, again claiming that it had the exclusive right to the generic phrase "campus management," and again demanding that Jenzabar cease using the TOTAL CAMPUS MANAGEMENT mark and the phrase "campus management."

69.     Jenzabar has a valid and legal right to describe its software, goods, and services by use of the TOTAL CAMPUS MANAGEMENT mark and the phrase "campus management."

70.     In addition, Jenzabar's use of TOTAL CAMPUS MANAGEMENT poses no significant risk of consumer confusion.  Among other reasons, Jenzabar uses TOTAL CAMPUS MANAGEMENT as a tag line or slogan in conjunction with its other marks.  The '722 and '702 Registrations cover CMC's corporate name and do not correspond to any particular product or service CMC offers.

71.     The products and services offered by Jenzabar and CMC, moreover, are complex enterprise software systems that are marketed to sophisticated purchasers, who often conduct months-long procurement processes in which both Jenzabar and CMC submit proposals.  There is, simply put, no realistic risk of confusion.

72.     The lack of confusion is further evidenced by the fact that Jenzabar and CMC have coexisted and competed for nearly five years without confusion.

73.     CMC's conduct demonstrates its awareness that Jenzabar's use of TOTAL CAMPUS MANAGEMENT does not pose any real risk to CMC.  It waited nearly two years

before sending its first cease and desist later, then waited an additional three years before sending its second.  CMC has never followed up its threats with action.  CMC has, rather, acquiesced in Jenzabar's use of TOTAL CAMPUS MANAGEMENT.  CMC's latest threat is just another attempt to disrupt Jenzabar's business by creating doubt and uncertainty.

74.     Notwithstanding these facts, when Jenzabar filed this action, CMC chose to file counterclaims against Jenzabar, further attempting to disrupt Jenzabar's business despite the lack of merit of these claims.

75.     Jenzabar is likely to be damaged if CMC is permitted to assert the '722 and '702 Registrations against Jenzabar, or otherwise impair Jenzabar's use of the descriptive phrase "campus management" in its TOTAL CAMPUS MANAGEMENT mark, in which Jenzabar has legitimate rights and has made a substantial investment, including but not limited to by assertion of its counterclaims and its continuing vague (and unfounded) threats of infringement.

## COUNT III

### Violation of the Lanham Act – Federal Unfair Competition (17 U.S.C. § 1125(a))

76.     Jenzabar restates and re-alleges all of the allegations contained in Paragraphs 1 through 25 of its Complaint and Paragraphs 1 through 75 of this Counterclaim as if fully set forth herein.

77.     CMC has falsely misrepresented their rights to the generic and merely descriptive "campus management" language, and CMC has wrongfully attempted to register the '722 and '702 Registrations and subsequently to prevent others, including Jenzabar, from using the generic and merely descriptive "campus management" language.

78.     CMC has used vague threats and its counterclaim in this action to disrupt Jenzabar's business despite the lack of merits of these claims.

79.     CMC's conduct, as described herein, constitutes unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

80.     Unless enjoined by this Court, CMC will continue to do the acts complained of herein and continue to cause damage and injury, all to Jenzabar's irreparable harm, for which Jenzabar has no adequate remedy at law.

## COUNT IV

### Tortious Interference with Contractual Relations

81.     Jenzabar restates and re-alleges all of the allegations contained in Paragraphs 1 through 25 of its Complaint and Paragraphs 1 through 80 of this Counterclaim as if fully set forth herein.

82.     As described above, CMC has knowingly and intentionally interfered with Jenzabar's contractual relationships with its customers, employees, and former employees.

83.     CMC's interference was improper in motive and/or means.

84.     As a result of CMC's interference, Jenzabar has sustained substantial damages.

## COUNT V

### Tortious Interference with Advantageous Relations

85.     Jenzabar restates and re-alleges all of the allegations contained in Paragraphs 1 through 25 of its Complaint and Paragraphs 1 through 84 of this Counterclaim as if fully set forth herein.

86.     As described above, CMC has knowingly and intentionally interfered with Jenzabar's advantageous relationships with its customers and potential customers.

87.     CMC's interference was improper in motive and/or means.

88.     As a result of CMC's interference, Jenzabar has sustained substantial damages.

## COUNT VI

### Massachusetts Unfair and Deceptive Trade Practices and Unfair Competition
### (Mass. Gen. L. ch. 93A, §§ 2 and 11)

89.     Jenzabar restates and re-alleges all of the allegations contained in Paragraphs 1 through 88 of its Complaint and Paragraphs 1 through 19 of this Counterclaim as if fully set forth herein.

90.     At all times relevant to this Counterclaim, both CMC and Jenzabar were engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§ 2 and 11.

91.     CMC's unfair or deceptive acts or practices, as described herein, include the following:

a.      CMC has falsely misrepresented their rights to the generic and merely descriptive "campus management" language to the public and to the United State Patent and Trademark Office; and

b.      CMC has asserted their fraudulently obtained '722 and '702 Registrations against Jenzabar and others in an effort to prevent Jenzabar from using the generic and merely descriptive "campus management" language to describe their products and services.

c.      CMC has threatened Jenzabar with its Registrations in an effort to disrupt Jenzabar's business, despite knowing that it had no legitimate right to do so.

d.      CMC has intentionally interfered with Jenzabar's contractual relationships with its employees and former employees to obtain Jenzabar's confidential information, and then used that confidential information to interfere with Jenzabar's relationships with its employees, customers, and potential customers.

92.     Jenzabar has suffered irreparable harm, the loss of money, and damage to its reputation and goodwill as a result of CMC's employment of unfair methods of competition and unfair or deceptive acts of practiced described herein in trade or commerce in violation of M.G.L. c. 93A §§2 and 11, and CMC's conduct will likely continue to cause future damages and irreparable harm for which Jenzabar has no adequate remedy at law.

93.     CMC's unfair or deceptive acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts for the purposes of M.G.L. c. 93A, § 11, because, among other things, CMC's threatening letters were sent to Jenzabar in Massachusetts and the harm resulting to Jenzabar has been and will be suffered in Massachusetts where Jenzabar is located.

94.     CMC's unfair or deceptive acts or practices, as described above, were willful or knowing within the meaning of M.G.L. c. 93A, §§ 2 and 11.

## COUNT VII

## Violation of the Lanham Act – Fraudulent Registration (17 U.S.C. § 1120)

95.     Jenzabar restates and re-alleges all of the allegations contained in Paragraphs 1 through 25 of its Complaint and Paragraphs 1 through 94 of this Counterclaim as if fully set forth herein.

96.     CMC fraudulently misrepresented to the PTO that their CAMPUS MANAGEMENT CORP marks, including the generic and merely descriptive "campus management" language, were distinctive and that their use had been exclusive in order to overcome a descriptiveness rejection and to gain trademark registration.

97.     Jenzabar has been irreparably harmed as a result of CMC's fraudulent registration of their CAMPUS MANAGEMENT CORP marks as the '722 and '702 Registrations.

27

**PRAYERS FOR RELIEF**

**WHEREFORE, Jenzabar prays that the Court:**

1.   Enter judgment for Jenzabar and against CMC in each of the Counterclaim counts above;

2.   Enter judgment declaring that Jenzabar has not and is not infringing U.S. Trademark Registration Nos. 2,965,722 and 3,259,702;

3.   Enter judgment declaring that U.S. Trademark Registration Nos. 2,965,722 and 3,259,702 are invalid, void and unenforceable, and cancelling the registrations;

4.   Enter an order temporarily and permanently enjoining the defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with the defendants, from asserting, representing or alleging that Jenzabar or any of Jenzabar's customers, employees or agents has infringed and/or is now infringing U.S. Trademark Registration Nos. 2,965,722 and 3,259,702, and from threatening Jenzabar or any of Jenzabar's customers, employees or agents with trademark infringement litigation because of Jenzabar's use of the TOTAL CAMPUS MANAGEMENT mark;

5.   Enter an order declaring that Jenzabar has the right to carry out the conduct that has been accused by CMC of trademark infringement without any interference from CMC, its agents, employees, attorneys, licensees and related companies;

6.   Award Jenzabar damages against CMC in an amount to be determined at trial;

7.   Award Jenzabar its damages for CMC's violations of Mass. Gen. L. ch. 93A, trebled on account of CMC's knowing and willful conduct;

8.   Award Jenzabar its costs; interest; enhanced, special, statutory and/or punitive damages; and reasonable attorneys' fees, including those attorneys' fees to which Jenzabar is entitled pursuant to 15 U.S.C. § 1117 and Mass. Gen. L. ch. 93A; and

9.  Grant Jenzabar such other and further relief as this Court may deem just and proper.

## JURY DEMAND

JENZABAR, INC. demands a trial by jury on all issues so triable.


JENZABAR, INC.


By its attorneys,


 _/s/ Edward J. Naughton _____
Edward J. Naughton (BBO #600059)
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200
enaughton@brownrudnick.com

Daniel K. Hampton (BBO #634195)
Elizabeth R. Burkhard (BBO #666968)
HOLLAND & KNIGHT LLP
10 St. James Ave.
Boston, MA  02116
(617) 523-2700


Dated:   September 16, 2008
         Boston, Massachusetts


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent those indicated as non-registered participants on September 16, 2008.

/s/Edward J. Naughton _____
Edward J. Naughton (BBO #600059)

# 5573786_v3